UNITED STATES of America, Plaintiff,

v.

WESTERN ELECTRIC COMPANY, INC., et al., Defendants.

Civ. A. No. 82–0192.

United States District Court, District of Columbia.

April 28, 1995.

Donald Russell, Richard Liebeskind, Luin Fitch, U.S. Dept. of Justice, Robert E. Litan, Deputy Asst. Atty. Gen., Antitrust Div., Dept. of Justice, Washington, DC, for plaintiff.

Michael K. Kellogg, Austin C. Schlick, Kellogg, Huber, Hansen & Todd, Washington, DC, for defendant Bell Companies.

David W. Carpenter, Howard Trienens, Joseph D. Kearney, Sidley & Austin, Chicago, IL, Mark C. Rosenblum, Basking Ridge, NJ, for defendant AT & T.

Michael Salsbury, Anthony C. Epstein, Jenner & Block, Washington, DC, for defendant MCI.

## OPINION

HAROLD H. GREENE, District Judge.

### I

#### Introduction

Pending before the Court is a motion by the Regional Bell Operating Companies (Regional Companies) to modify Section II(D) of the decree to allow them to provide cellular and other wireless services across LATA boundaries.[1] In essence, the Regional Com-

---

1. This motion was filed jointly by all the Regional Companies. BellSouth and Southwestern Bell also filed separate motions to remove the equal access requirement of Section II(A) of the decree, and to remove the interexchange prohibition of Section II(D). For reasons elaborated below, the Court finds that the decision on the joint motion forecloses the result sought in the Bell-

panies wish to be able to offer interexchange service (colloquially referred to as long distance service) to their cellular customers.

This motion comes before the Court with mixed reactions from the other parties. The Department of Justice supports the motion, but only if certain conditions are imposed upon the Regional Companies. The interexchange carriers, on the other hand, oppose the motion, even if the Department's conditions are incorporated. Intervenors and amici have taken various positions, some vigorously opposing the motion, others expressing support.

When the motion was first filed, congressional action on a telecommunications bill seemed imminent. For that reason, *inter alia,* the Court deferred consideration of the matter pending such action. However, when it became obvious that a bill would not be enacted in the 103rd Congress, the Court began considering the motion in earnest and convened a hearing on the matter. At that hearing, the Court sought and received additional guidance on the key questions raised by the motion. Having considered this additional guidance, as well as the full record, the Court now concludes that, to a degree and with certain conditions, the motion should be granted.

In order to understand how this motion is being resolved, one must first understand the factual and legal context in which it arises.

## II

### *The Bottleneck Issue*

The Regional Companies have made it a central theme of their argument in support of the waiver that the American public will benefit from more competition in cellular long distance, and that they are a potentially significant resource in this respect. The Court does not disagree with these propositions. Competition is basic to the decree in this case, and it obviously should be fostered. *See* Part VI, *infra.*

South/Southwestern Bell motions. The Court will therefore not discuss these separate motions

The Court's commitment to the protection and enlargement of competition in telecommunications of course includes competition in the cellular portion of long distance. Thus, the Court's immediate inclination was to permit the Regional Companies to enter this market, for both on the basis of their experience in telecommunications and their access to the necessary capital, these companies are particularly well suited to operate in this field as effective competitors to the more entrenched long distance carriers. Beyond that, the Court—as others, in Congress and elsewhere—is of course desirous of terminating the restrictions in the decree when this can prudently be done, rather than enshrining them as permanent features of the business landscape.

That, however, can only be accomplished when the conditions which gave rise to those restrictions no longer exist. Put most simply and bluntly, restrictions on long distance service by the Regional Companies can be completely eliminated only when these companies no longer have the capacity to exploit what has throughout this litigation been termed the "bottleneck." Lest the significance of that condition has been lost to the memory of those who are part of the telecommunications business or have the obligation and power to regulate that business, through legislation or otherwise, it is still worthwhile to recapitulate, briefly, why the bottleneck concept plays such a central role here.

As the Court explained in its approval of the decree proposed by the Department of Justice and AT & T (the two parties to the underlying antitrust action), the Bell System's anticompetitive activities, which had surfaced in the evidence during the eleven-month trial of this case, were made possible in large part "because of its control of the local Operating Companies—whose facilities were and are needed for interconnection purposes by AT & T's competitors. . . ." *United States v. American Tel. & Tel.,* 552 F.Supp. 131, 162 (D.D.C.1982). The Court further noted at that time that, with divestiture, the Regional Companies' guarantee of access to

in detail.

the network by all long distance carriers would be meaningful only because the Regional Companies "will not be providing [long distance] services" of their own. *Id.* at 165. Other, similar expressions are found throughout the Court's Opinion that approved the decree, as well as in subsequent Orders and Opinions of the Court. *See, e.g.,* especially, *United States v. Western Electric Co., Inc.,* 673 F.Supp. 525 (D.D.C.1987) (Triennial Review Opinion).

Thus, in the Triennial Review in 1987, the Court emphasized the central role of the bottleneck in these terms:

> The first question must necessarily be whether the Regional Companies have retained monopoly control of an "essential facility".... It was their control of [such essential facilities] that gave the Bell System its power over the competition. That control enabled the System to foreclose or impede interconnection to its network of lines of its long distance competitors and of the equipment produced by its manufacturing rivals. It also made possible the subsidization of one activity with the profits achieved in another. As long as the Regional Companies retain these same bottlenecks, the potential for the same or similar anticompetitive conduct is plainly still present.

673 F.Supp. at 536 (internal citations omitted). The concepts expressed in that Opinion still apply today, and the Court continues to be informed by their logic. The continued existence of bottlenecks remains the factual predicate for the interexchange restriction. Before the Regional Companies can enter a new market they will have to show that there is no substantial possibility that they could use their bottleneck monopoly control to impede competition in that market.

The Regional Companies and the Department of Justice advance different responses to this bedrock proposition. The Regional Companies attack the factual predicate for the restriction, arguing that there is no bottleneck in this particular market. The Justice Department, on the other hand, acknowledges that the bottleneck problems continue to exist, but it contends that these problems can be adequately resolved if certain conditions, which as a practical matter will reduce the risk that the Regional Companies will discriminate against the long distance competitors, are placed on their entry into the long distance cellular market. The Court examines the Regional Company argument in Parts III and IV, *infra,* and the Department of Justice submission in Part V, *infra.*

### III

#### *Cellular Operation*

In order to evaluate the assertion that there is no bottleneck in this particular market, one must first understand some basic facts about how cellular phone service works. What follows below, therefore, is a brief bit of background on the logistics involved in cellular calls in general and long-distance cellular calls in particular.[2]

When a cellular customer places a call, that "call" actually goes through a number of different steps before it reaches the party the customer has dialed. First, the transmission proceeds to the "cell" that is nearest to the customer's phone. If the customer is in an automobile, for instance, the transmission will go to a nearby cell along the road. That call will then be passed from cell to cell until it reaches the Mobile Transit Switching Office. This mobile switching office is the central switch for the particular cellular company. Once the call reaches the mobile switch, the question then arises as to how best to route the call to complete the transmission. If the call is a local one, the choice is easy. The call is merely handed over to the local exchange company (usually the particular Regional Company), and the local exchange company completes the call through the local network.

If the call is a long-distance call, however, the situation becomes more complicated. The call must eventually get from the mobile switch to the "Point of Presence" of the customer's chosen interexchange carrier. At the present time, the overwhelming majority of calls proceed on this route through some sort of facility provided by the local exchange

2. This description is based essentially on submissions by the parties.

carrier, usually one of the Regional Companies. The calls proceed either through the regular local exchange or else they advance by way of a dedicated access system—which is likewise provided by the local carrier. Either way, in their journey from the mobile switch to the interexchange point of presence, the vast majority of calls are handled by the Regional Company. A remaining small minority of calls are carried by Competitive Access Providers that are not affiliated with the Regional Companies.

This process raises a bottleneck problem because, as noted, in most instances the Regional Companies control a key step in the process. That is not precisely the same bottleneck problem as arises in landline service, but it raises the same types of issues. For the "Mobile Bottleneck"[3] gives the local companies (usually the Regional Companies) the ability to control a part of virtually every interexchange cellular call, just as the Landline Bottleneck gives these companies similar, albeit more complex, control over every wired interexchange call.

This Mobile Bottleneck control would be critical if the Regional Companies were allowed also to carry cellular calls on a long distance basis; these companies would then have both the power and the incentive to use this control against their competitors in the cellular long distance business. This potential discrimination directly parallels the discrimination that led to the interexchange restriction in the first place. In this way, the Mobile Bottleneck on the surface raises the same dangers as does the Landline Bottleneck.

The Regional Companies contend that the Mobile Bottleneck is unlike the Landline Bottleneck, and that it should be treated differently. They point to two facts to support this argument.

First, they cite statistics about the increasing use of "dedicated access lines" from mobile switches to the interexchange carriers.

They argue that the use of these dedicated access lines allows calls to bypass the general local exchange. The gist of this argument is that, because the calls are not passing through the traditional Landline Bottleneck, there is no problem.

This argument proves too much. Most importantly, it overlooks the fact that, although the dedicated access lines bypass the local exchange, they are still controlled by the local exchange carrier. What that means, of course, is that the local companies still control a key step in the process, and they would still have the potential to discriminate against competitors in the cellular interexchange business. In other words, the Mobile Bottleneck is just as much of a problem when dedicated access lines are used as when calls are routed directly through the local exchange.

The Regional Companies also argue that the increasing use of Competitive Access Providers shows that the Mobile Bottleneck is not a real bottleneck. They contend that Competitive Access Providers provide a real alternative to facilities provided by the particular Regional Company, and that the interexchange carriers could use the facilities provided by Competitive Access Providers if they are truly concerned about discrimination by a Regional Company. If Competitive Access Providers were available all over the country and could provide viable competition, the Court would be in complete agreement with the Regional Companies on this point. In fact, it is this Court's strongest hope that such competition will quickly flower and that that competition will justify a wholesale removal of the wireless interexchange restriction.

But even the Department of Justice concedes that this day has not yet come. Statistics show that Competitive Access Providers carry at this time only a relatively small portion of the calls that proceed from mobile switches to interexchange carriers.[4] Fur-

---

3. For simplicity's sake, the Court will hereinafter refer to this bottleneck as the "Mobile Bottleneck" so as to avoid confusion with the more familiar "Landline Bottleneck."

4. The parties disagree on the precise statistics on this question. In its original filings on this issue,

AT & T claimed that the local exchange carriers had 100% of the market for access to the interexchange carriers from the mobile switches. Later submissions by the Regional Companies and the amicus State of California, however, indicated that there were areas, like Pittsburgh, where AT

thermore, such processes are often quite expensive.[5] More important for this Court, however, is the fact that Competitive Access Providers do not even exist in most areas. In these areas, then, the Mobile Bottleneck is simply a practical reality.

In the large majority of cases, therefore, the bottom line is that long distance carriers are dependent on facilities provided by local exchange carriers. This means that the Regional Companies would have the usual structural advantage over their competitors if they were allowed to provide long distance service to their cellular customers. And the Regional Companies once again would be in a position to disadvantage long distance competitors by virtue of their control over key local facilities.

## IV

It does not follow, however, that the motion of the Regional Companies must be denied. What is significant, with respect to this issue, is that the situation varies from State to State and apparently even from one subdivision to another in some of the States. Further, the geographical field in which cellular long distance competition is feasible

may be expected to widen further in relatively short order.

Unlike in 1987,[6] there are now some areas where the Mobile Bottleneck is not complete. In those areas, non-Regional Company providers are able to set up the connection from the mobile switch to the interexchange point of presence. Moreover, as a practical matter, the Mobile Bottleneck is not as difficult to bypass as the Landline Bottleneck. A company need not create an entire local network to get around the Mobile Bottleneck; it needs only to create a system to carry calls from the mobile switch to the interexchange carrier's point of presence. Indeed, the very existence of Competitive Access Providers demonstrates that this type of bypass constitutes a viable option. Finally on this issue, there is also some indication that the interexchange carriers themselves can provide the bypass, either through collocation of the mobile switch and the point of presence or otherwise.

On the other hand, in some areas there may still be legal or regulatory impediments to providing this type of bypass.[7] However, the existence of Competitive Access Providers in various States is proof that there are some locations where there are no legal barriers to providing a bypass around the Mo-

---

& T relied on a Competitive Access Provider to route calls from the mobile switches to their point of presence. No one, however, claims that the bypass is extensive. Even the Regional Companies concede that at least 90% of all cellular long distance calls are transmitted through facilities provided by the local exchange carriers. AT & T and MCI claim that the percentage is even higher.

5. MCI noted at the hearing on this motion that, although it would be delighted to support such Competitive Access Providers, it was unable to afford their use for any of their cellular calls.

6. In 1987, the Court was faced with a similar request by the Regional Companies for a waiver to allow them to provide interexchange services to their cellular customers. *United States v. Western Elec. Co., Inc., supra,* 673 F.Supp. at 550–52. At that time, the Court found that the Regional Companies could not meet the test for a waiver. *Id.* As explained below, however, conditions have changed sufficiently since that time - to merit a fresh look at the issue.

7. When asked at the hearing on this motion about the legal impediments to competition, the

parties each focused on different aspects of the process and came to very different conclusions. The Regional Companies discussed the legal structure governing cellular systems in general and concluded that there could be no impediments under local law because all such local law had been preempted by FCC regulation of cellular systems. Thus, in the Regional Companies' view, there was no legal problem.

The interexchange carriers, on the other hand, focused on the legal impediments to provision of general local exchange services. At the hearing on this motion, they explained that there were numerous legal and regulatory barriers to their entry into the local market.

The Court has concluded that neither side provides the full picture. The Court's question was about the legal impediments to providing bypass around the Mobile Bottleneck. This bypass is neither a purely cellular service nor a purely local exchange service. The Competitive Access Providers which currently offer a bypass service are not cellular licensees nor are they full competitors in the local exchange. Thus, it is not clear that they would be directly covered by either the FCC regulations or by the local law governing local exchange competition.

bile Bottleneck.[8] It is thus clear that areas exist in this country where, at least as a legal matter and to some extent as a practical matter, there is viable competition in providing a bypass around the Mobile Bottleneck.

The Court recognizes, of course, that this competition is just emerging, and that the Competitive Access Providers carry only a relatively small portion of the calls that proceed from mobile networks to the interexchange carriers. But they do carry some calls in some areas, and in these areas, interexchange carriers are ipso facto not at the mercy of a Regional Company bottlenecks. They have a choice, and in some instances, AT & T, for one, has apparently chosen to use these alternative channels.[9]

■ The question, therefore, is whether the Court should grant the waiver for those areas where there is genuine evidence of competition in providing access from mobile networks to the interexchange carriers, to be extended when new areas of such competition emerge. The Court has determined that it should.

First, the Court has always stated that the decree should not be enshrined in perpetuity—that it should not stand as a needless barrier to competition when the dangers of monopoly power are not implicated—and the Court is eager to promote new avenues of competition where it can do so safely.

Second, the Court can here promote two types of competition, while still protecting the core of the decree. The most obvious type of competition is new competition in long distance calling for cellular customers in these areas. A second important type of competition that will be fostered is that of carrying calls from the mobile switches to the interexchange networks.

At the moment, only a few fledgling companies provide this alternative bypass and,

according to the interexchange carriers, they have only a small portion of the market. This may be due at least in part to the fact that the interexchange carriers have no incentive to use these specialized carriers because the local companies are currently providing efficient connections. However, this situation could change if the Regional Companies are allowed to provide interexchange service to their customers in these areas. To the extent that the interexchange carriers fear discrimination by the Regional Companies, they will have a new incentive to choose the Competitive Access Providers. This new incentive could lead to greater revenues for these providers which could, in turn, lead to growth in this industry.

All of these developments would serve the dual purpose of increasing competition and increasing the likelihood that the decree[10] will not continue to be necessary forever.

■ The bottom line is that, in areas where there is no local legal impediment and there is a Competitive Access Provider, the interexchange carriers will have a choice. Some may not like their choice, *see* footnote 9, *supra,* but it is not the Court's job to protect individual competitors—it is to protect competition. And the Court has determined that competition will not only be protected but fostered by granting the waiver in these limited areas.

Given these benefits, the Court has concluded that the goal of increasing competition would be best served by granting the motion (1) subject, as described in Part V, *infra,* to some of the conditions proposed by the Department of Justice, and (2) limited to areas where there are no legal or regulatory impediments to providing the bypass around the Mobile Bottleneck, and where at least one such Competitive Access Provider is already in operation.[11]

---

8. Because there is no evidence to the contrary on the record, the Court assumes that the Competitive Access Providers are operating in compliance with any relevant laws.

9. MCI maintains that it has never made that choice because it would not be economical. But that is MCI's choice. It does not claim that it is somehow prohibited from using the Competitive

Access Providers. It has simply chosen not to do so.

10. Or a substitute with similar restrictions in the form of legislation.

11. The Court notes that, if there are any areas where full local competition has developed, the motion will also be granted with respect to those areas.

## V

### *Conditions*

As can readily be seen, too many intangibles remain necessarily unresolved, and the possibility of discrimination and cross-subsidization remains too high at the present time that safeguards may entirely be dispensed with. As indicated above, the Department of Justice has recommended that the Court attach conditions to any order growing out of the present controversy which will minimize the attendant risks. The Court finds that, for the present, most of these conditions should be applied, as explained below.

The Department's proposed order contains five basic conditions to be imposed on the Regional Companies, as follows.

First. The Department proposes that the Court issue an injunction against discrimination. The injunction would make clear that the Regional Companies would be required to provide the same type and quality of services to other interexchange providers as they would provide to themselves. While the proposed injunction would have some utility, the Court has consistently noted that to enjoin discrimination is not adequate, as a practical matter, to prevent it. *See United States v. Am. Tel. & Tel., supra,* 552 F.Supp. at 167–68. Beyond that, the proposed injunction would merely reiterate the already existing obligation of the Regional Companies not to discriminate against competing companies. And finally, an injunction here would add yet another order for this Court to enforce. For these reasons, the Court has concluded that the proposed condition does not have sufficient utility for inclusion in the Order being issued at this time.

Second. The Department's proposal also contains a separate subsidiary requirement. Interexchange services from cellular networks would be limited to services provided by corporations that have been established as separate subsidiaries from the BOC's local exchange companies and are physically and operationally separate from LEC facilities. This condition is designed to reduce the risk of discrimination in the provision of interexchange access by requiring the provision of local and interexchange service to be effected by entities that would be separate, both structurally and physically.

The separate subsidiary requirement would also reduce the risk of cross-subsidization, that is, the risk that the Regional Companies would use profits obtained from the provision of local service to lower the price of more competitive long distance service. To be sure, the Court has not in the past accepted the separate subsidiary requirement as a cure-all for attempted or anticipated anticompetitive conduct. Nevertheless, the Court will adopt the separate subsidiary condition here, for it would, at a minimum, complicate the task of discrimination and cross-subsidization.

Third. The Department of Justice would next require each Regional Company to submit an "equal access plan."[12] The plan would have to be approved by the Department before the Regional Companies could begin to provide interexchange services to cellular customers. In each such plan, the Regional Companies would detail how they intend to implement equal access on a non-discriminatory basis. The plans would include procedures for informing customers of their choices for interexchange services, the terms and conditions whereby interexchange carriers not controlled by the Regional Company would be offered the opportunity to interconnect to that Regional Company's mobile switch, and other specifics regarding the provision of interexchange service.

The Department submits that these plans would reduce the risk of discrimination by requiring the Regional Companies to formulate non-discriminatory modes of operation before they could provide long distance service to cellular users, and by giving the Department a concrete plan against which to evaluate the Regional Companies' behavior. The Court agrees that this condition will be effective in the manner proposed by the Department, and therefore will include it in the Order.

Fourth. The Department would also require that the Regional Companies sell only long distance service that they purchased

---

12. The Regional Companies do not oppose the imposition of this condition.

from other providers, and that they purchase no more than 45% of their interexchange needs from any one source. Because under this condition the Regional Companies would not be able to construct or operate their own interexchange facilities, they would presumably have less of an incentive or ability to favor their own facilities with better treatment. Furthermore, if a Regional Company were to discriminate against other interexchange sellers, it would have to do so in collusion with the entity selling its interexchange service to the Regional Company—a somewhat risky enterprise. Additionally, because each Regional Company would be required to purchase interexchange service from at least three different sellers, the chances of effective, non-detected collusion would be reduced. The Court believes that this condition is a salutary one, and it will be included in the Order.

Fifth. The Department's order contains a requirement that the Regional Companies "unbundle" and market separately their local and interexchange services.[13] This condition would require the Regional Companies to price separately their local and long distance cellular service, so that customers could effectively compare their service with that of competing companies. Furthermore, if the Regional Companies intend to provide one bill to cellular customers for local and long distance service, they would have to provide the same opportunity to other long distance providers. Additionally, under the Department's proposal, the Regional Companies would have to market their long distance services separately from their local service, and use a separate sales force to market interexchange service. Unless this is done, says the Department, customers could, with one inquiry, learn about local and long distance service from a Regional Company, while being required to make several inquiries to discover the availability of competing carriers.

In the Court's view, the unbundling provision is probably the most important of the proposed conditions. This condition provides interexchange carriers with a genuine opportunity to compete for customers' business. Requiring the Regional Companies to offer separately and market separately their local and long distance cellular service would allow customers to compare the Regional Companies' long distance offerings with the service offered by competing long distance carriers. Because it will help to prevent monopolization and aid the consumer, the unbundling requirement will be included in the Order.

To sum up, although salutary in effect, none of these conditions constitute a panacea. The Department of Justice conceded as much at oral argument on the proposed waiver, when it noted that the conditions would not eliminate the risk of discrimination, but instead would merely reduce the risk to "acceptable levels." It is for that reason that, while the conditions will be imposed by the Court, they—and the waiver itself—will apply only in areas where there is no legal impediment to local bypass and there exists, in fact, a bypass organization. This provides as much of a guarantee against anticompetitive behavior as can be achieved, other than by an outright denial of the waiver request. But, as stated at the outset, the Court is unwilling to deny the waiver request on that basis, because to do so would be to throttle a promising avenue of competition in appropriate States and political subdivisions of States. The Court is therefore granting the waiver to the extent it can do so without jeopardizing the goals of the decree. As long as the Regional Companies are able to show that they meet the requirements set out above, they will be permitted to provide long distance service to cellular customers.

Logistically, in order to begin providing such service, the Regional Companies will be required to certify to the Department of Justice that they have met the prerequisites in the Order and that they have an equal access plan that complies with the terms set out in that Order.[14] Once the Department verifies that the objective criteria laid out in this Opinion and the accompanying Order have been met and approves the equal access

---

13. The Regional Companies oppose certain specifics of this condition, but do not oppose it in general.

14. See also, section VII of the decree.

plan, the particular Regional Company will be authorized to provide interexchange service to cellular customers in accordance with those plans. In areas where Competitive Access Providers are already in service, the Regional Companies should be able to move quickly to obtain authorization. Furthermore, as Competitive Access Providers move into new areas, the Regional Companies are of course free to seek authorization for those areas as well.

The purpose of the accompanying Order is to prescribe the specific criteria by which the Department of Justice is to evaluate the certifications from the Regional Companies. It lays out all of the requirements that must be met before authorization is given.[15] Furthermore, because the determination that the Department must make is relatively straightforward, the Order requires the Department to make that decision within 90 days of receiving the certification from the Regional Company.

## VI

### Conclusion

Free and fair competition, unimpeded by monopoly power, is at the core of the decree in this case, and as the Court has had occasion to note in the past, in this respect the decree has been eminently successful.

Competition has brought down long distance rates by some 50%[16] in the eleven years since the AT & T break-up (taking inflation into account). Perhaps even more important, the decade has witnessed an unprecedented flowering of innovation, in sharp contrast to the preceding era when the Bell System as an impregnable monolith was not subjected to the stimulus of competition, and for that reason did not bother greatly to bring new products to either commerce or the consumer.[17] In fact, as some commentators have noted, the United States is far ahead of European nations in such technological advances as the "information superhighway" because these nations, unlike this country, failed to foresee the progress that could be expected from a break-up of the telephone monopoly.[18]

Wireless is the next large step. It is the Court's hope and expectation that, with the measures established here to stimulate effective, large-scale competition, cellular and other wireless telecommunications will rapidly progress as have other aspects of the industry, and that this mode of communication will likewise become inexpensive and useful in a variety of ways.

As the same time, to allow the Regional Companies to enter the cellular long distance market without safeguards against their possible exploitation of their local bottlenecks would be to take a giant step backward—at least in the promising wireless market—to the situation as it existed when the Bell System was the largely unchallenged monop-

---

15. The decision about whether or not the Regional Companies may offer cellular long distance services has been made in this Opinion and the accompanying Order. The Court has made the determination that, when certain objective criteria are met, the Regional Companies are authorized to provide long distance service to their cellular customers. The Department's role is simply to determine whether those prerequisites are met: if they are, the Regional Companies may offer long distance services to their cellular customers.

16. Computations by different experts have arrived at figures between 40% and 65%.

17. It is not an exaggeration to state that today's telecommunications, with all of its refinements and sophistication—from FAX to voice mail, from call waiting to Internet innovations—bears little resemblance to the industry prior to the 1980s when, to paraphrase Henry Ford, the Bell System furnished to the consumer any telephone he wanted, as long as it was rotary and black. *See also*, Aaron Zitner, *10 Years Later, Bell Break-up's Impact Grows,* Boston Globe, Dec. 27, 1993 at A1 (tracking the decline in long distance rates and the flowering of innovation that has occurred since the break-up).

18. An article in Newsweek last fall linked the success of the United States in the race to create an information superhighway to the break-up of AT & T. Bill Powell and Daniela Deane, *Roadkill on the Infobahn,* Newsweek, October 24, 1994, at 42. The article explained that a major reason why the Europeans are lagging behind in this race is that their telecommunications systems still resemble AT & T before the break-up. *Id.* According to this piece, the monopoly provider in each country has driven prices up and downgraded the market for services like the Internet that are carried over phone lines. *Id.*

olist. The conditions attached by the Court to the grant of this motion should ensure that this will not occur.

This course is consistent with the policy this Court has pursued throughout the period when it has been responsible for oversight of the decree: to loosen the restrictions so as to permit the Regional Companies to enhance competition in various markets when possible, yet to do so prudently in order to prevent a return to the anticompetitive practices which caused the decree to be entered in the first place.

With the conditions and limitations discussed above, the motion is granted.

### ORDER

Upon consideration of the Regional Companies' Motion for a Modification of Section II(D) of the Decree to Permit Them to Provide Cellular and Other Wireless Service Across LATA Boundaries, the responses, oppositions, and replies thereto, and the entire record in this case, and for the reasons set forth in the Opinion accompanying this Order, it is this 28th day of April, 1995

ORDERED that the Regional Companies' motion be and it is hereby GRANTED subject to the limitations and conditions set forth below; and it is further

ORDERED that a new Section VIII(L) shall be added to the Decree as follows: "VIII(L)" Wireless Interexchange Service

### 1. *Definitions*

For the purpose of this Section:

a. "MTSO" means Mobile Telephone Switching Office and the equipment used therein to provide for the handoff of a Wireless Exchange Service subscriber's call as it moves between cell sites and to switch calls between Wireless Exchange Systems and landline networks of local and interexchange carriers. "MTSO" within the meaning of this Section also includes the home and visitor registers, wherever located, that facilitate the provision of carrier selection, roaming and call completion services, including the routing or redirection of calls to Wireless Exchange Service subscribers at locations outside the Wireless Exchange System, or to other de-

vices such as voice storage or paging systems.

b. "Wireless Exchange Carrier" means an entity that is a carrier within the meaning of the Communications Act of 1934 and that provides Wireless Exchange Services.

c. "Wireless Exchange Services" means commercial mobile services, as defined in 47 U.S.C. § 332(d)(1); provided, however, that a Regional Company's Wireless Exchange Services are limited to services provided by corporations that have been established as separate subsidiaries from the Regional Company's local telephone exchange companies ("LECs"), and provided, further, that the principal facilities used to provide Wireless Exchange Services, including the MTSO and radio base stations, are physically and operationally separate from LEC facilities.

d. "Wireless Exchange System" means the MTSO, cell sites, connecting transmission lines, and other facilities which are operated or controlled by a Wireless Exchange Carrier and used to provide Wireless Exchange Services in an exchange area.

### 2. *Limitations and Conditions*

Subject to the conditions stated in this Section and as supplemented by the requirements of the compliance plans to be filed pursuant to subsection 5, a Regional Company's Wireless Exchange System shall be permitted to provide the interexchange telecommunications services enumerated in subsection 3 "a" through "f," subject to the following limitations, terms, and conditions:

a. A Regional Company's Wireless Exchange System may provide cellular interexchange telecommunications services only in areas where it demonstrates (i) that there are no legal or regulatory barriers to the provision of access services by non-Regional Companies from the MTSOs to the interexchange carriers' points of presence; and (ii) that there is at least one such non-Regional Company providing such alternative access.

b. The services authorized by paragraphs a, b, and c of subsection 3 shall be limited to the resale of switched interexchange services procured pursuant to tariff

from unaffiliated interexchange carriers, and not more than 45% of any Regional Company's Wireless Exchange System's interexchange minutes of use shall be purchased from any one interexchange carrier.

c. The interexchange telecommunications services authorized by paragraphs d, e, and f of subsection 3 shall be provided using interexchange facilities leased from unaffiliated interexchange carriers.

d. The requirement that a Regional Company's Wireless Exchange Service customers shall be permitted to select their own interexchange carrier shall not apply (i) if a Regional Company is providing interexchange service to customers in connection with its resale of the service of an unaffiliated Wireless Exchange Carrier that does not provide equal access; (ii) if a Regional Company is providing interexchange services to a roaming customer that has neither selected an interexchange carrier nor dialed a carrier access code, or where the customer's selected interexchange carrier does not provide service to the visited wireless system; or (iii) if a Regional Company is providing interexchange telecommunications service authorized by paragraphs d, e, or f of subsection 3.

3. *Wireless Interexchange Telecommunications Services Permitted*

a. Originating Wireless Interexchange Service, *i.e.*, calls originating from a Wireless Exchange System and routed through an MTSO.

b. Call Completion Services, *i.e.*, interexchange services resulting when a caller directs a call to a subscriber of a Wireless Exchange Carrier that has instructed that carrier to forward calls to a location in another exchange area. Such remote locations may include a network address (such as a telephone or paging number) stored at the MTSO, or a voice mailbox or similar storage facility. In such cases, the Regional Company may provide only the interexchange portion of the call from the point where it is redirected by the subscriber's Wireless Exchange Carrier's MTSO.

c. Calling Party Pays services which include interexchange telecommunications services may be provided by the Regional Companies to offer subscribers of Wireless Exchange Services a service whereby the provider offers subscribers use of a telephone number that allows the subscriber to receive calls at a flat, non-distance sensitive, rate (including air time and long distance charges) that are billed to the calling party. Any Regional Company offering this service must make available on a nondiscriminatory basis any MTSO functions or databases required for other service providers to offer similar services.

d. Cellular Digital Packet Data Services ("CDPD") that incorporate interexchange telecommunications may be provided by the Regional Companies insofar as this service is limited to one that is offered in accord with Internet TCP/IP Protocol Suite and OSI Suite as defined by Internet RFC 791 or any functionally equivalent service in which multiprotocol network services providing wireless packet data to wireless communications users are offered by delivering data to a centralized switching or routing point from which the data is transferred or routed to a destination in the same exchange area (which may be an Internet node) designated by the customer or to an Interexchange Carrier chosen by the customer on an unbundled and nondiscriminatory basis at a point within the same exchange area in which the centralized switching or routing point is located.

e. Wireless Messaging and Signaling that includes interexchange telecommunications services may be provided by the Regional Companies to the extent such functions are limited to transmission of IS–41 or like messages among Wireless Exchange Systems or other carriers' facilities, including messages regarding the status of subscribers' terminal equipment and call handling instructions from subscribers. The MTSO functions used to provide this service shall be available to other carriers, including interexchange carriers, providing similar services.

f. One-way Paging with Acknowledgement and Radiolocation Services.

### 4. *Equal Access Requirements*

a. The authority to provide interexchange services authorized by this Section is conditioned on the Regional Company's commitments that:

(1) Each Regional Company's local telephone exchange company and Wireless Exchange System shall offer to all interexchange carriers interconnection, exchange access, and exchange services for such access, on an unbundled basis.

(2) Each Regional Company or affiliate thereof shall state separately to its customers the prices, terms, or rate plans for (i) Wireless Exchange Services and (ii) interexchange telecommunications services.

b. If the Regional Company bills its long distance customers for that service in the same billing as for its Wireless Exchange Service, it shall make that billing arrangement available to competing interexchange carriers on reasonable and nondiscriminatory terms.

c. Each Regional Company shall notify unaffiliated interexchange carriers of changes to existing Wireless Exchange Services or the addition of new services that affect the interexchange carrier's interconnection with wireless exchanges at least 60 days prior to implementation.

d. A Regional Company shall not treat its interexchange service as the default carrier for a new customer that fails to make the required selection of an interexchange carrier. Customers who fail to select an interexchange carrier and do not dial an access code will not receive interexchange service from their wireless telephones.

e. A Regional Company providing interexchange services pursuant to this Section shall not accept exchange access from any Wireless Exchange System in which it has any financial interest except on an unbundled basis that is equal in type, quality, and price to that provided to unaffiliated interexchange carriers. No Regional Company shall accept the benefit of discrimination by any such Wireless Exchange System in the provision of exchange access, exchange services for such access, establishment or dissemination of technical information, interconnection and use of facilities, or provision of new services and the planning for and implementation of the construction or modification of facilities.

f. Retail store agents of Regional Companies' Wireless Exchange Systems and other Regional Company salespersons who receive inquiries by prospective Wireless Exchange Service subscribers (the "wireless exchange sales force") shall not recommend, sell, or otherwise market the interexchange service of any interexchange carrier, and shall administer interexchange carrier selection procedures on a carrier-neutral and nondiscriminatory basis.

g. Persons selling the Regional Company's interexchange services authorized by this Section (the "long distance sales force") may also market and sell Wireless Exchange Services subject to the following conditions:

(1) The long distance sales force shall be a distinct group of individuals, with separate managers, from the wireless exchange sales force and from any sales force that sells products or services of the Regional Company's local telephone exchange companies.

(2) The long distance sales force shall receive any list of the Regional Company's Wireless Exchange Service customers on the same terms, and at the same time, as that list is received by competing interexchange carriers. Regional Company Wireless Exchange Systems shall at quarterly intervals provide all long distance carriers with listings identifying the names and addresses of all Wireless Exchange Service subscribers, regardless of the sales force by which the subscriber was obtained.

(3) The long distance sales force shall advise actual or prospective subscribers of their right to presubscribe to competing interexchange carriers.

(4) The long distance sales force shall not receive any information about the identity of the Regional Company's Wireless Exchange System's customers' interexchange carrier or the wireless customers' cellular or long distance usage, unless the customer is already a customer of the Regional Company's interexchange service.

(5) The long distance sales force shall state separately the prices, terms, and rate plans for Wireless Exchange Services and interexchange telecommunications services.

5. *Interexchange Wireless Compliance Plans*

a. Any Regional Company electing to provide interexchange services pursuant to this Section shall file compliance plans for the implementation of its provisions with the United States Department of Justice. The Department shall determine whether the compliance plan meets all the prerequisites established by the Court herein within 90 days of receiving the plan from the Regional Company. Such plans shall not be effective until the Department has made such a determination. The Regional Company shall have no authority to provide interexchange telecommunications services pursuant to this modification until such plans become effective.

b. Each Regional Company's compliance plan shall include a certification and evidence to the Department of Justice showing (1) that there are no legal or regulatory impediments to the provision of access from the MTSOs to the interexchange companies' points of presence by a non-Regional Company, and (2) that there is at least one such non-Regional Company providing such access in the area from which the Regional Company wishes to provide Wireless Interexchange Telecommunications Services.

c. Each Regional Company's compliance plans shall include a plan for implementing equal access on a nondiscriminatory basis in the context where the Regional Company's access provider is also a competing interexchange carrier. These plans shall include the following: detailed procedures for implementing equal access from any Wireless Exchange System where a Regional Company acquires a controlling interest after the effective date of this Section; procedures for identifying to new Wireless Exchange Service customers their choices for interexchange services; the terms and conditions whereby unaffiliated interexchange carriers will be offered the opportunity to intercon-

nect at any Regional Company's Wireless Exchange System's MTSO; the procedures for disseminating to interexchange carriers any planned changes in network services or plans for implementing new services that may affect such carrier's services; procedures for assuring that any personnel of a Regional Company's Wireless Exchange Carrier that is involved in the marketing of interexchange services shall not have access to proprietary information of other interexchange carriers, including but not limited to network interconnection arrangements and lists of interexchange carrier customers or their usage statistics; a plan for the separation of the personnel that market interexchange services from the personnel that administer presubscriptions; a plan for implementing Calling Party Pays service if the Regional Company wishes to offer such a service; a plan describing its procedures to assure compliance with subsection 2(e) of this Section (including a plan for providing nondiscriminatory access to IS-41 or similar databases for all carriers); and a plan for implementing CDPD service.

d. Each Regional Company shall supplement the plans required as necessary to describe significant changes in the matters reflected in the plans."

IT IS FURTHER ORDERED that the separate motions by BellSouth and Southwestern Bell be and they are hereby DENIED insofar as they seek relief other than that authorized herein.